Filed 12/18/24  In re A.R. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | C100088 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>K.P. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. JD241440, JD241441, JD241442, JD241443, JD241444) |

K.P. (mother) and T.R. (father) appeal from juvenile court orders terminating parental rights to three of their children, A.R, C.R., and P.R.  Mother and father (parents) contend the Sacramento County Department of Child, Family and Adult Services (the department) failed to comply with the inquiry requirements of the California statutes implementing the Indian Child Welfare Act (25 U.S.C. § 1912).  For simplicity, we collectively refer to those California statutes and the Indian Child Welfare Act as ICWA.

1

Father separately contends the court prejudicially erred in finding the beneficial parental relationship exception to adoption (the parental relationship exception) inapplicable to his eldest son, C.R. (son).

The department concedes the ICWA inquiry error but claims father's contention regarding the parental relationship exception lacks merit.

We agree with the department as to the parental relationship exception. We also accept the department's ICWA concession, so we conditionally reverse the order terminating parental rights and remand for the limited purpose of ICWA compliance. Undesignated statutory references are to the Welfare and Institutions Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2021, parents' five children were placed in protective custody via warrant after father was arrested for driving under the influence with the children in the car and with the passenger door open. Mother, who is father's wife, was also in the car and under the influence. At that time, an out-of-state court order prohibited mother from having unsupervised contact with three of the children. Also, the previous month, mother had given birth to the youngest child and both mother and the baby tested positive for marijuana.

The juvenile court found a prima case to detain the children, later adjudged them dependents of the court, and ordered reunification services. For purposes of the 18-month review hearing,[1] the department recommended termination of those services

---

[1] Administration of dependency cases requires recurrent reviews of the status of the parents and the children. (*In re Candace P.* (1994) 24 Cal.App.4th 1128, 1132.) These reviews are referred to as "6-month," "12-month," and "18-month" reviews. (*Ibid*.) The 18-month review represents a critical juncture in a dependency proceeding. (*In re J.E.* (2016) 3 Cal.App.5th 557, 563; see 366.22, subd. (a).) The minor must either be returned to the physical custody of his or her parent or the court must terminate reunification

2

because parents had not made significant or consistent progress in completing their case plans and had not taken accountability for the actions that led their children to dependency. The court agreed. It terminated reunification services and set a hearing under section 366.26.

At the section 366.26 hearing in December 2023, the department recommended permanency services for the two oldest children and termination of parental rights for the three youngest, including son. Parents submitted to the recommendation for the two oldest children but objected to termination for the three youngest, arguing that the parental relationship exception applied. The juvenile court found insufficient evidence to prove that termination would be detrimental to the three youngest children, terminated parental rights as to them, and ordered they be placed for adoption. Parents timely appealed.

## DISCUSSION

### I

### *Parental Relationship Exception*

Father contends the juvenile court prejudicially erred in finding the parental relationship exception to adoption inapplicable to father and son. We disagree.

" ' "Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' " [Citation.] "A section 366.26 hearing … is a hearing specifically designed to select and implement a permanent plan for the child." [Citation.]' " (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 814.) The possible permanent plans are listed in order of preference in section 366.26, and adoption has the highest priority. (§ 366.26, subd. (b)(1).)

---

services and set a hearing for the selection and implementation of a permanent plan (a section 366.26 hearing). (*In re J.E.,* at pp. 563-564.)

If the court determines that the child is adoptable, it must "terminate parental rights and order the child placed for adoption" unless an exception applies. (§ 366.26, subd. (c)(1).) One such exception is the parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) To establish that exception, the parent must show three elements: "(1) the parent maintained 'regular visitation and contact with the child, taking into account the extent of visitation permitted' [the first element]; (2) 'the child has a substantial, positive, emotional attachment to the parent' [the second element]; and (3) 'terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home' [the third element]." (*In re Andrew M., supra*, 102 Cal.App.5th at p. 815.) The parent bears the burden of proof of establishing each element. (*Ibid.*) Father contends he did so with respect to son. We disagree. We focus on the third element, but we begin with additional background on the father-son relationship.

A.    Additional background on father-son relationship

Son was five years old when he was removed from parents' custody. Early on after removal, the department reported that son expressed how much he missed father. Son recounted that father taught him the ABCs, how to count, and how to ride a bike. Son's caretakers also reported that son was depressed, would sleep all day except for eating, would not interact with anyone in the household, got sad when anyone talked about father, and had a difficult time leaving family visits.

In September 2021, the department informed the court that some parental behaviors during visits with the children were causing issues. At one visit, father smelled of marijuana and there was very little engagement between parents and children because the children were using parents' cell phones. Father requested separate visits, claiming mother was the source of the issues. The court adopted a general visitation order, giving the department the discretion to order separate visits.

4

By February 2022, visits between the children and parents continued to be supervised and problematic because parents provided cell phones and unhealthy snacks to the children and father sometimes showed up smelling like marijuana. Meanwhile, son had adjusted well to his caretakers' home and started receiving weekly mental health services. The social worker confirmed with son that he missed his parents and wanted to live with them. Son was also demonstrating verbal and physical aggression at school, refusing to complete schoolwork, and having a difficult time potty training during school hours. Son's caretakers developed a plan with a social worker and a family advocate to address those issues.

By September 2022, parents' behavior at visits continued to be a problem because parents needed to be redirected and did not respond well to the redirection. The problems sometimes caused visits to end early and made staff feel uncomfortable with continuing in-person visits altogether. Visits that ended early caused many of the children to cry or become hysterical. At the same time, son had started first grade, was still participating in weekly mental health services, and was in the process of getting assessed for an individual education plan. Son reported that he wanted to reunify with parents but enjoyed staying with his caretakers until that was possible. The following month, the court approved son to receive psychotropic medication after son's doctor reported he was having behavioral issues, emotional dysregulation, anger, and depression and struggling with being away from parents and dealing with other past trauma.

By January 2023, son had obtained an individual education plan and had a behavioral assistant to help him in class. He was not having behavioral issues at home but was continuing to have them at school. The department stated that son appeared to be happy and bonded to his caretakers, but he still wanted to return to his parents. Visits with parents saw some improvements but then mother began displaying previous inappropriate behaviors.

By April 2023, visits with parents had stabilized, but they remained supervised, and the children appeared happy to see their parents. At the 18-month hearing held that month, a social worker testified that father might be ready for unsupervised visits, but the social worker remained concerned regarding his ability to ensure mother did not participate. Father testified that any issues the children were having, behaviorally or at school, were due to their missing parents and suggested that the children did not need any extra help in school or have special needs. The juvenile court ordered termination of reunification services, noting father's previous failure to follow a court order regarding unsupervised time with mother and his failure to take any "responsibility for creating any of the trauma in his children's lives."

Between early April and September 2023, visits between parents and children remained supervised and were reduced to once per month. Parents often brought food, drinks, electronics, and chargers for the electronics for the children. Son primarily played a racing game on father's phone during most visits. Parents also typically played music and danced with the children, in which son sometimes engaged.

By September 2023, son had been with the same caretakers for two years and one month and was regularly attending school and receiving special education and mental health services. The caretakers reported that son was benefiting from the psychotropic medication, having no behavior outbursts, and meeting some of his individual education plan goals. The caretakers were "strong advocates" for him, had gotten to know his special needs and learned ways to best support him, and were committed to providing him permanency. Due to his young age (seven years old), son did not understand the concept of adoption when asked but reported that he "likes his current placement."

At the section 366.26 hearing in December 2023, father testified that he loved, missed, and wanted his children, and that they should never have been taken away from him in the first place. Specifically with respect to son, father testified that during their visits, he gives son his phone or tablet and teaches son to play a game or watches son

6

play on the device. Father comments on the game while son plays, and son cries when the visits are over. At their last visit, son gripped and grabbed onto father and stated he was ready to come home. Son calls father "dad" and they share the same birthday. When asked how son and the other youngest children would feel if they could not have any more visits with him, father replied that how they would feel wasn't the right question, but rather how father would feel.

B.      Analysis

Father contends there was substantial evidence showing that termination of parental rights would harm son. In support, he relies on (1) son's emotional state when he was first removed from father's care, (2) son's behavioral difficulties at school during dependency, (3) son's sadness when visits ended, and (4) son's need for psychotropic medication because he was struggling being away from parents. But father understates the complexity of the required analysis. In the required analysis, the juvenile court must consider not only the detriment to the child of severing the relationship but also the countervailing positives the child gains in a permanent stable home and whether the positives outweigh the detriment. (*In re Caden C.* (2021) 11 Cal.5th 614, 625, 633-634 (*Caden C.*).)

The other problem with father's contention is the standard of review. We review the third element (whether terminating the relationship would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home) under a "hybrid standard." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.) We review the juvenile court's factual determinations concerning the harms and benefits to the child for substantial evidence but its ultimate weighing of the harms and benefits for abuse of discretion. (*Caden C., supra*, 11 Cal.5th at p. 640.) In reviewing for substantial evidence, we consider the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

7

And in reviewing for abuse of discretion, if two or more inferences can reasonably be deduced from the facts, we do not substitute our judgment for that of the trial court. (*Caden C., supra*, 11 Cal.5th at p. 641.)

Here, even assuming father's view of son's harm has support in the record, other evidence supports a different view. Specifically, the record indicates that son's behavioral issues were not solely attributable to separation from parents, and the court could infer, as it did when it terminated reunification services, that father had some responsibility for creating the trauma that led to those issues. The record also supports the conclusion that son's adoptive home would alleviate son's behavioral issues and any emotional instability that severing the parental relationship might cause. (See *Caden C., supra*, 11 Cal.5th at p. 633 [court may consider whether a new, stable home "may alleviate the emotional instability and preoccupation" that severing the parental relationship may cause].) Son had spent just over two years with the same caretakers and had formed a bond with them. Those caretakers advocated on his behalf, were addressing his behavioral needs, and were ready to adopt him. And son was receiving behavioral and educational support outside the home, both of which father had discounted as unnecessary. The court could reasonably conclude that father's dismissal of son's educational and behavioral needs would be detrimental to son if the father-son relationship were maintained. For these reasons, we conclude that the juvenile court did not abuse its discretion in determining that the detriment to son of severing his relationship with father did not outweigh the benefits of the permanent adoptive home.

II

*ICWA*

Parents contend the department failed to make the statutorily required inquiry under ICWA. We agree and start by providing some additional background.

8

A.    Additional background

At the initial hearing, parents denied having Native American heritage, and the court found ICWA inapplicable.  Over the next two months, the department identified various extended family members, several of  whom were interested in placement, including a paternal aunt, a maternal aunt, and two maternal cousins.  Several months later, the department admitted it needed to do further ICWA inquiry into extended relatives.  The court then revised its finding at the initial hearing that ICWA did not apply and asked the department to continue to make inquiries of relatives.  At the next ICWA compliance hearing, the department reported that ICWA compliance remained incomplete.  The department later reported that a social worker left a message for a paternal aunt and uncle, could not find a number listed for the paternal grandmother, and had performed research on ancestry.com to locate family members.  It concluded that no family member reported Native American heritage and ICWA thus did not apply at this time.  The court accepted this report and found ICWA inapplicable.  Nearly a year later, the department had contact with another extended relative regarding possible placement.

B.    Analysis

Under ICWA, child welfare agencies are charged with "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child" in dependency cases.  (§ 224.2, subd. (a).)  Child welfare agencies discharge this duty by "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child."  (*Id*., subd. (b)(2).)

Parents contend the department failed to make adequate inquires of extended relatives in this case.  The department concedes the error and requests that we conditionally *affirm* the order terminating parental rights subject to full compliance with ICWA.

9

We accept the department's concession but follow *In re Dezi C.* (2024) 16 Cal.5th 1112 (which was decided after the department filed its brief) and conditionally *reverse* the order terminating parental rights. (*Id.*, at p. 1125; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We remand for the department to make additional inquiry and documentation efforts consistent with its ICWA duties and then for the juvenile court to hold a hearing to determine whether, as documented, ICWA applies. (*In re Dezi, supra*, 16 Cal.5th at p. 1136.)

## DISPOSITION

The orders terminating parental rights are conditionally reversed, and the matter is remanded for the following limited purpose. The department will conduct additional inquiry in accordance with section 224.2, document its inquiry in compliance with California Rules of Court, rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3. If the juvenile court determines that the department's additional inquiry was proper, adequate, and duly diligent, and concludes that ICWA does not apply, the termination orders will be reinstated. If, however, the juvenile court concludes ICWA applies, then it will conduct a new section 366.26 hearing and proceed in conformity with ICWA.

/s/
MESIWALA, J.

We concur:


/s/
DUARTE, Acting P. J.


/s/
RENNER, J.